UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STING SOCCER GROUP, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0964-B |
| | § | |
| RATED SPORTS GROUP, L.P., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Rated Sports Group L.P. ("Rated")'s Motion to Dismiss First Amended Complaint (Doc. 11). For the reasons stated below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.

## BACKGROUND

This is a case about rival "Texas Cup" soccer tournaments. Plaintiff Sting Soccer Group, L.P. ("Sting"), based in Addison, Texas, has operated soccer clubs for girls and young women since 1973. Doc. 9, Am. Compl., ¶¶ 7–9. In recent years, Sting expanded its programs to also serve boys and young men. *Id.* ¶ 10. It maintains soccer clubs across Texas and in Pennsylvania. *Id.* ¶ 11.

For over 30 years, Sting "has hosted the annual Texas Cup soccer tournament" (the "Texas Cup"). *Id.* ¶ 12. The Texas Cup "is a major event in Texas soccer that hosts hundreds of teams each year" and is held in the Dallas area over the Thanksgiving weekend. *Id.* More than 225 teams participated in the 2019 event and "[o]ver 100 collegiate coaches and representatives attended from across the United States to evaluate and scout players." *Id.* Sting promotes the event at

https://texascupsoccer.com. *Id.* ¶ 18.

In 2021, Rated, a California-based "'event management and sports marketing' organization", "began advertising for a Texas Cup soccer tournament to occur [in the Dallas area] over Memorial Day weekend 2021" (the "Rated Texas Cup"). *Id.* ¶¶ 15, 17. Rated obtained the URL https://texascup.com and "set up a web site to advertise this tournament . . . employ[ing] a blue and red color scheme mimicking the Sting Texas Cup's blue and red color scheme." *Id.* ¶ 18.

According to Sting, the Rated Texas Cup sowed confusion in the youth soccer community. Believing the Rated Texas Cup to be affiliated with Sting, "local hotels . . . reached out to Sting seeking to offer room blocks" for the event and "multiple soccer team representatives . . . reached out to Sting asking if Sting [was] involved in" the new tournament. *Id.* ¶ 20. At least one Dallas soccer club emailed Rated expressing concern about the Rated Texas Cup's name:

> I disagree with the fact that you took the name of an already existing event and tagged your tournament with the same name. The Texas Cup has been a tournament in town at Thanksgiving hosted by Sting soccer club going back almost as far as I can remember. Either you didn't do any research or you are intentionally trying to piggyback off the original Texas Cup's success.

*Id.* ¶ 22.

Sting sent a letter demanding that Rated cease and desist using Sting's trademark "Texas Cup." *Id.* ¶¶ 13, 23. After receiving the demand letter and the "aforementioned email correspondence . . . Rated renamed its event the Texas Super Cup." *Id.* ¶ 23. But Rated's marketing materials and social media posts continued to reference the "Texas Cup," and Rated continued to use the texascup.com URL. *Id.* ¶ 23.

On April 21, 2021, Sting sued in Texas state court seeking declaratory relief, monetary damages, and a temporary restraining order ("TRO"). Doc. 1-3, Original Pet. Before the state court's

hearing on the TRO motion, Rated timely removed the case to federal court. Doc. 1, Not. Removal. Sting did not re-file its TRO motion after the removal. *See* Doc. 6, Order. On June 8, 2021, Sting filed its Amended Complaint, bringing six causes of action: (1) Trademark Infringement (15 USC § 1125(a)); (2) Common Law Trademark Infringement and Unfair Competition; (3) Federal Trademark Dilution; (4) Injury to Business Reputation or Trademark Under Texas Law ("Texas Dilution"); (5) Violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"); and (6) Unjust Enrichment. Doc. 9. On June 22, 2021, Rated moved to dismiss the Amended Complaint for failure to state a claim. Doc. 11. The motion has been fully briefed and is now ripe for review. The Court considers it below.

## II.

## LEGAL STANDARD

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). If a plaintiff's complaint fails to state such a claim, Rule 12(b)(6) allows a defendant to file a motion to dismiss. FED. R. CIV. P. 12(b)(6). In analyzing a motion to dismiss for failure to state a claim under Rule 12(b)(6) "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

A Rule 12(b)(6) motion to dismiss should be granted only if the complaint does not include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Well-pleaded facts of a complaint are to be accepted as true. *Id.* But, legal conclusions are not "entitled to the assumption of truth," nor will a complaint suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Further, a court is not to strain to find inferences favorable to the plaintiff or accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success but only determines whether the plaintiff has pleaded a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

## III.

## ANALYSIS

A.    *Trademark Infringement Under 15 USC § 1125(a)*

To establish trademark infringement under the Lanham Act, a plaintiff must show (1) ownership of a legally protectable mark and (2) a likelihood of confusion between its mark and the allegedly infringing mark. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235–36 (5th Cir. 2010). Rated claims that TEXAS CUP is not a legally protectable mark. Doc. 11, Mot., 2–8. Sting claims it sufficiently pleads that TEXAS CUP is legally protectable and that there is a likelihood of confusion between the two Texas Cup tournaments. Doc. 14, Resp., 1–11. Below, the Court finds that Sting has plausibly pled that TEXAS CUP is a descriptive mark that has acquired

secondary meaning in the soccer marketplace and is therefore legally protectable. Sting has also plausibly pled a likelihood of confusion between the two soccer tournaments. Therefore, Sting has stated a claim for trademark infringement under the Lanham Act.

    1.    Whether the Mark is Legally Protectable

The Lanham Act provides that a trademark may be "'any word, name, symbol, or device, or any combination thereof' that is used or intended to be used 'to identify and distinguish' a person's goods 'from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'" *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008) (quoting 15 U.S.C. § 1127). "A mark need not be registered in order to obtain protection because 'ownership of trademarks is established by use, not by registration.'" *Id.* (quoting *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin*, 909 F.2d 839, 842 (5th Cir. 1990)). The mark at issue in this case is unregistered. *See* Doc. 11, Mot., 2; Doc. 14, Resp., 1–2.

"The protectability of unregistered marks is governed generally by the same principles that qualify a mark for registration under the Lanham Act." *Smack Apparel Co.*, 550 F.3d at 475 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). "The key is whether the mark is 'capable of distinguishing the applicant's goods from those of others.'" *Id.* (quoting *Two Pesos, Inc.*, 505 U.S. at 768).

    *I.*    *Sting adequately pleads that the TEXAS CUP mark is descriptive*

"To assess the distinctiveness of a word mark," courts in the Fifth Circuit use the spectrum "set forth by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 537 (5th Cir. 2015).

*Abercrombie* sets out five categories of trademarks: "(1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Id.* "[S]uggestive, arbitrary, and fanciful marks are inherently distinctive," but "generic marks cannot be distinctive, and descriptive marks are distinctive only if they have acquired 'secondary meaning.'" *Id.* (quoting *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 268 (5th Cir.1999)). To "categoriz[e] a term, [courts] must examine the context in which the term is used," including "how [the term] is used with other words, the products or services to which it is applied, and the audience to which the relevant product or service is directed." *Id.* (quoting *Union Nat'l Bank of Tex.*, 909 F.2d at 847 (quotation marks omitted) (alteration in original)).

Here, Rated states that TEXAS CUP is generic, because Sting's "Texas Cup" tournament is merely one example of a class of "Texas cup" soccer tournaments hosted by other organizations, including the "Texas Gold Cup," "Texas State Cup," "South Texas Cup," and "North Texas Soccer State Cup" events. Doc. 11, Mot., 1. Alternatively, Rated states that TEXAS CUP is descriptive, because "Texas" is "the geographically descriptive name of the location" where the event is held, Doc. 11, Mot., 3, while "the term 'cup' is commonly used in various sports tournaments" including "soccer tournaments such as the World Cup." *Id.*

Sting argues that it sufficiently alleges "that the 'Texas Cup' mark is suggestive (and thus protectable). Doc. 14, Resp., 3. For this argument, Sting relies on *Dallas Cowboys Football Club, Ltd. v. America's Team Properties, Inc.*, 616 F. Supp. 2d 622 (N.D. Tex. 2009). In *Dallas Cowboys*, the Dallas Cowboys Football Club argued that its mark AMERICA'S TEAM was suggestive because "it hints that the goods and services offered under the mark are sports-related, but does not refer to football or to the fact that the Cowboys are located in the Dallas area." *Dall. Cowboys*, 616 F. Supp. 2d at 635. The Cowboys' opponent argued that AMERICA'S TEAM was "simply descriptive." *Id.*

The *Dallas Cowboys* court agreed with the Cowboys that AMERICA'S TEAM "does not indicate that the 'team' in question is located in Dallas . . . arguably making at least one part of the mark suggestive." *Id*. However, it found "the suggestiveness of the 'America's Team' mark [was] thin at best, therefore warranting an examination of possible secondary meaning." *Id*. at 636. In concluding that AMERICA'S TEAM had "acquired . . . secondary meaning among consumers" the court considered factors including the Cowboys' use of the mark for 30 years "in a variety of contexts and across a range of products." *Id*.

Sting reasons that, like AMERICA'S TEAM, TEXAS CUP "suggests 'that the goods and services offered under the mark are sports-related, but does not refer to [soccer] or to the fact that the [Texas Cup is] located in the Dallas area.'" Doc. 14, Resp., 3 (alterations in original) (quoting *Dall. Cowboys*, 616 F. Supp. 2d at 635). Sting alternatively argues that TEXAS CUP, like AMERICA'S TEAM, is descriptive and "has achieved significant secondary meaning." *Id*. at 4.

The Court finds that Sting has adequately pled that TEXAS CUP is, at a minimum, descriptive. TEXAS CUP is clearly not a generic term that "names a 'class' of goods or services, rather than any particular feature or exemplification of the class." *See United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2304 (2020); *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009). However, the pleadings plausibly establish that the mark—like AMERICA's TEAM—is either "descriptive of a product," a soccer tournament held in Texas, or "thinly" suggestive. *See Dall. Cowboys*, 616 F. Supp. 2d at 635–36 (citing *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000)). So, the Court next considers whether Sting adequately pleads secondary meaning.

ii.   *Sting adequately pleads that the TEXAS CUP mark has attained secondary meaning*

"Secondary meaning 'occurs when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself."'" *Smack Apparel Co.*, 550 F.3d at 476 (quoting *Wal-Mart Stores*, 529 U.S. at 211) (alteration in original). To determine the presence of secondary meaning, courts consider "the public's mental association between the mark and the alleged mark holder" and whether the mark "'has come through use to be uniquely associated with a specific source.'" *Id.* (first citing *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 427 (5th Cir. 1986), then quoting *Pebble Beach Co. v. Tour 18 I Lt*d. 155 F.3d 526, 536 (5th Cir. 1998). The Fifth Circuit "applie[s] a multi-factor test for determining secondary meaning," considering: "(1) length and manner of use of the mark . . . , (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark . . .  in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the [mark]." *Id.* "These factors in combination may show that consumers consider a mark to be an indicator of source even if each factor alone would not prove secondary meaning." *Id.* (quoting *Pebble Beach*, 155 F.3d at 541).

Rated argues that Sting has not shown that TEXAS CUP has developed secondary meaning, because Sting: (1) doesn't allege use that is "continuous and commercial in nature," (2) only in "recent years" began marketing to co-ed youth soccer teams, and (3) has not alleged facts regarding "volume of sales; amount of advertising; consumer survey evidence; exclusivity of use; and proof of deliberate infringement." Doc. 11, Mot., 5. Rated categorizes Sting's marketing efforts, conducted by "word of mouth, . . . distribution of marketing/advertising, on the internet, through a website, and [through] participation in the soccer community," as "minimalist" and notes that Sting does not

allege specific "advertising expenditures" to address the "amount" component of the "amount and manner of advertising" factor. *Id.* at 5–6. Rated also argues that, even if Sting has sufficiently alleged the extent of its promotional efforts regarding the mark, it has not sufficiently alleged that its efforts have been effective in ensuring that "the consuming public" associates "Texas Cup" with Sting. *Id.* at 6. Rated claims it is "particularly fatal . . . that Plaintiff has failed to allege facts related to spending and advertising that support a plausible finding for the public's association between Plaintiff and 'Texas Cup.'" *Id.* at 7.

Sting notes that its pleadings establish that it "has hosted the . . . Texas Cup. . . for over 30 years" and that it "is a major event in Texas soccer that hosts hundreds of teams each year." Doc. 9, Am. Compl., ¶ 12. Only Sting has "us[ed] the term 'Texas Cup' to name a soccer tournament during those 30-plus years." *Id.* "In 2019, the Texas Cup hosted over 225 teams . . . [and] [o]ver 100 collegiate coaches and representatives . . . from across the United States." *Id.* Moreover, "Sting has actively and continuously used, maintained, and promoted the Texas Cup trademark" through various promotional channels. *Id.* ¶ 13. And, Rated's use of the mark has "caused actual confusion in the community . . . [as] local hotels have reached out to Sting seeking to offer room blocks for the Rated Texas Cup[,] . . . multiple soccer team representatives have . . . ask[ed] if Sting is involved in the Rated Texas Cup tournament[,] . . . [and] Sting teams themselves have been tricked into registering with the false Rated Tournament." *Id.* ¶¶ 20–21.

Here, taking Sting's factual allegations as true and considering them in light of the Fifth Circuit's factors, the court finds that Sting plausibly alleges that the public has come to exclusively associate the TEXAS CUP with Sting. *See IVFMD Fla., Inc. v. IVFMD, P.A.*, 2014 WL 11515574, at *6–7 (N.D. Tex. Mar 7, 2014). To the first factor, Sting has, for more than 30 years, exclusively

- 9 -

and continuously used the TEXAS CUP mark to identify its nationally known annual youth soccer tournament. Doc. 9, Am. Compl., ¶ 12. To the second factor, hundreds of youth soccer teams and more than 100 collegiate coaches and staff from across the country have attended the Texas Cup, indicating that the volume of sales related to the TEXAS CUP mark is substantial. *Id.* To the third factor, Sting has advertised the Texas Cup by "word of mouth, distribution of marketing/advertising, on the internet, through a website, and in participation in the soccer community." *Id.* ¶ 13. To the sixth factor, Sting pleads that local hotels reached out to Sting to offer room blocks for the Rated Texas Cup and that "multiple soccer team representatives . . . reached out to Sting asking if Sting is involved in the Rated Texas Cup." *Id.* ¶¶ 20–21. And to the seventh factor, Sting claims that Rated intended to profit off Sting's established mark and goodwill, and that it continued to use the mark even after it was notified of the alleged infringement. *Id.* ¶¶ 19, 23, 25. While Sting has not addressed factors four and five, it need not address every factor for the totality of the factors to support a finding of secondary meaning. *See, e.g., Pebble Beach*, 942 F. Supp. at 1539 (finding that a golf course had established secondary meaning in the mark HARBOUR TOWN where it did not present consumer survey evidence). Therefore, Sting has sufficiently alleged that its mark is legally protectable.

    2.    <u>Likelihood of Confusion</u>

"[I]n determining whether a likelihood of confusion exists," the Fifth Circuit considers the following factors: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008)

(quoting *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir. 1986)). "The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported even by a majority of the . . . factors.'" *Id.* (quoting *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)). On a motion to dismiss under Rule 12(b)(6), "the court need not fully weigh all the factors—the test is simply whether the complaint's allegations, taken as true, show the claim of likelihood of confusion is plausible." *E.g., Jim S. Adler, P.C. v. Angel L. Reyes & Assocs. PC*, 2020 WL 5099596, at *6 (N.D. Tex. Aug. 7, 2020) (citing *John Crane Prod. Sols., Inc. v. R2R & D, LLC*, 2012 WL 1571080, at * 3 (N.D. Tex. May 4, 2012)); *IVFMD Fla.*, 2014 WL 11515574, at *6–7.

Here, the Court finds that Sting's allegations, taken as true, plausibly support a finding that there is a likelihood of confusion between the Sting and Rated Texas Cups. Even if the TEXAS CUP mark falls near the middle of the mark-strength spectrum, Sting pleads that Rated used an identical tournament name; that the URL that Rated obtained for its tournament, texascup.com, is "strikingly similar" to Sting's texascupsoccer.com URL; that both events are youth soccer tournaments marketed to the same pool of nationally-competitive teams; that "Sting teams . . . have been tricked into registering for the" Rated Texas Cup; that Rated's marketing materials continued to use the Sting mark after Sting objected; and that "multiple soccer team representatives have reached out to Sting asking if Sting is involved in the Rated Texas Cup tournament." Doc. 9, Am. Compl., ¶¶ 12–23. Taken together, these facts plausibly support a finding of likelihood of confusion. *See John Crane Prod. Sols.*, 2012 WL 1571080 at *3.

Thus, the Court finds that Sting has adequately pled (1) the existence of a legally protectable mark and (2) likelihood of confusion. Therefore, the Court **DENIES** Rated's motion to dismiss

- 11 -

Count 1.

B.    *Common Law Trademark Infringement and Unfair Competition*

"The gravamen for any action of trademark infringement or common law unfair competition is whether the challenged mark is likely to cause confusion." *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir. 1985). So, pleadings that adequately allege a "likelihood of confusion between Plaintiff and Defendant's marks" under the Lanham Act may also support a finding that the plaintiff has stated a claim for common law trademark infringement and unfair competition. *See Tesoros Trading Co. v. Tesoros Misticos, Inc.*, 10 F. Supp. 3d 701, 718 (N.D. Tex. 2014). As discussed above, Sting has adequately pled that TEXAS CUP is legally protectable and that the Rated Texas Cup is likely to cause confusion with the Sting Texas Cup. The Court likewise finds that Sting has stated a claim for common law trademark infringement and unfair competition.

Therefore, the Court **DENIES** Rated's motion to dismiss Count 2.

C.    *Federal Dilution*

Section 1125© of the Lanham Act allows the owner of a famous mark to bring claims against any person who dilutes that mark. 15 U.S.C. § 1125©. Whether the mark at issue is "famous" is a threshold question. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1372 (Fed. Cir. 2012). The standard of fame required for a dilution case is stringent. *Id.* at 1373 (citing 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24:104 at 24-290 (4th ed. 2011)). For a dilution claim, fame "'is an either/or proposition'—it either exists or does not." *Id.* (quoting *Palm Bay Impts., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1375 (Fed. Cir. 2005)).

A famous mark is one "widely recognized by the general consuming public of the United

States as a designation of source of the goods or services of the mark's owner." 15 U.S.C.

§ 1125(c)(2)(A). "In determining whether a mark possesses the requisite degree of recognition, the

court may consider all relevant factors, including the following:

> (I) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
> (iii) The extent of actual recognition of the mark.
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Id.* § 1125(c)(2)(A)(i)–(iv).

Rated claims that TEXAS CUP is not a famous mark by this standard. Doc. 11, Mot., 8–9.

Sting argues that for a federal dilution claim a mark "need only be famous within its specific industry

or market." Doc. 14, Resp., 11 (quoting *Galvotec Alloys, Inc. v. Gaus Anodes Intern., LLC*, 2014 WL

6805458, at *9 (S.D. Tex. Dec. 2, 2014). Rated replies that "[t]he 2006 Federal Trademark Dilution

Act effectively removed [the] 'niche fame'" standard Sting cites, "replac[ing] it with the [current]

widespread recognition requirement." Doc. 15, Reply, 7. The Court agrees with Rated.

As this Court noted in *Springboards to Education v. Scholastic Book Fairs, Inc.*, only marks

"widely recognized by the general consuming public of the United States" are famous as defined by

the statute after the 2006 Amendments. 2018 WL 1806500, at *4 (N.D. Tex. Apr. 17, 2018) (citing

*Bd. of Regents, Univ. of Tex. Sys. ex rel. Univ. of Tex. at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657,

673 n.13 (W.D. Tex. 2008)). Fame only in a limited geographic area or niche market—niche

fame—will not support a federal dilution claim. *Id.*; *see also* 4 MCCARTHY ON TRADEMARKS AND

UNFAIR COMPETITION § 24:105 (5th ed. 2017) ("The use of niche fame is forbidden by the 2006

revisions to federal law.")).

Examples of nationally famous marks include "Budweiser beer, Camel cigarettes, Barbie dolls, and the like." *Shippitsa Ltd. v. Slack*, 2019 WL 3304890, at *10 (N.D. Tex. July 23, 2019) (quoting *Springboards to Educ.*, 2018 WL 1806500 at *4). "Other examples of famous marks include the JUST DO IT Nike slogan, the STARBUCKS mark, the MCDONALD'S mark, and the PEPSI mark." *Id.* By contrast, allegations based on a specific market or special interest group generally support only a finding of niche fame. *See, e.g., id.* at *11 (nutritional supplement consumers); *Springboards to Educ.*, 2018 WL 1806500 at *4 (educators); *see also KST Elec., Ltd.*, 550 F. Supp. 2d at 677–78 (sports fans); *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 699 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012) (whiskey drinkers).

Here, Sting's pleadings support at most an inference that TEXAS CUP is famous among a niche market of soccer teams, players, coaches, and local hotels. *See Springboards to Educ.*, 2018 WL 1806500, at *4. First, Sting alleges that it has "actively and continuously used, maintained, and promoted the Texas Cup trademark . . . by way of . . . marketing/advertising materials, on the internet, through a website, and in participation in the soccer community." Doc. 9, Am. Compl., ¶ 13. But these assertions are "simply too vague" to plausibly show "that [Sting's] marks are famous in the sense a federal dilution claim requires." *See Springboards to Educ.*, 2018 WL 1806500, at *4. Nor do Sting's pleadings plausibly show "that its mark[] [is] 'widely recognized by the general consuming public of the United States." *Id.* Sting alleges that it has advertised the mark through "participation in the soccer community," has hosted the Texas Cup "for over 30 years," and that the event attracts hundreds of soccer teams, coaches, and collegiate scouts from across the county. Doc. 9, Am. Compl., ¶¶ 12–13. It also pleads that "local hotels have reached out to Sting seeking to offer room blocks" for Rated's Texas Cup, showing that these businesses associate the mark with Sting.

*Id.* ¶ 20. But these allegations "indicate[] reputation only within a specific market"—the youth and collegiate soccer community, and perhaps the local businesses that host teams for the event. *See Springboards to Educ.*, 2018 WL 1806500, at *5.

In conclusion, Sting has not plausibly alleged "that the fame of its mark[] is on par with the fame of the Nike JUST DO IT mark, the BUDWEISER beer mark, or other similar marks." *Springboards to Educ.*, 2018 WL 1806500, at *5. The Court therefore **GRANTS** Rated's motion and **DISMISSES WITH PREJUDICE** Sting's Count 3.

D.    *Texas Dilution*

Under Texas law, "the owner of a mark that is famous and distinctive . . . in this state is entitled to enjoin another person's commercial use of a mark . . . if use of the mark . . . is likely to cause the dilution of the famous mark." Tex. Bus. & Com. Code Ann. § 16.103(b)). A mark is famous under Texas law if it:

> is widely recognized by the public throughout this state or in a geographic area in this state as a designation of source of the goods or services of the mark's owner. In determining whether a mark is famous, a court may consider factors including:
> > (1) the duration, extent, and geographic reach of the advertisement and publicity of the mark in this state . . . ;
> > (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark in this state;
> > (3) the extent of actual recognition of the mark in this state; and
> > (4) whether the mark is registered in this state or in the United States Patent and Trademark Office.

*Id.*

The Texas dilution standard is "substantially consistent with" the federal dilution standard, though the geographic scope differs. *Springboards to Educ.*, 2018 WL 1806500, at *5 & n.7 (quoting Tex. Acts 2011, 82nd Leg., ch. 563 (H.B. 3141), § 3 ("The intent of this Act is to provide a system of trademark registration and protection in this state that is substantially consistent with the federal

system of trademark registration and protection under the Trademark Act of 1946, as amended. To that end, the construction given to the Trademark Act of 1946 (15 U.S.C. Section 1051 *et seq.*) should be examined as persuasive authority for interpreting and construing this Act.")); *Mott's LLP v. Comercializadora Eloro, S.A.*, 507 F. Supp. 3d 780, 788 (W.D. Tex. 2020) (noting that "though the Texas 'fame' analysis is similar to the one under federal law, the geographic scope is different").

Here, Sting pleads that the TEXAS CUP mark "has become famous and distinctive in North Texas and throughout the state of Texas." Doc. 9, Am. Compl., ¶ 13. Sting also pleads that it has held and promoted the Texas Cup for more than 30 years, that the event is "a major event in Texas soccer that hosts hundreds of teams each year," and that Texas consumers associate the Texas Cup with Sting Soccer. *Id.* ¶¶ 12–13. But these allegations do not plausibly assert that the general public "throughout the state of Texas or in a geographic area in this state" would recognize the mark—only that members of the soccer community would. *See* Tex. Bus. & Com. Code Ann. § 16.103(b); *see also Springboards to Educ.*, 2018 WL 1806500, at *5 (noting that a markholder "must make plausible [allegations] that the 'general consuming public' knows its marks, not just that [members of a niche market do]"). Sting also does not plead that the TEXAS CUP mark is registered in Texas or with the United States Patent and Trademark Office. *See* Doc. 9, Am. Compl. This is another factor weighing against a finding of famousness. *See* Tex. Bus. & Com. Code Ann. § 16.103(b)(4).

So, the Court concludes that Sting has not alleged that its mark is famous and distinctive as required for a dilution claim under Texas law. The Court therefore **GRANTS** Rated's motion and **DISMISSES WITH PREJUDICE** Sting's Texas dilution claim (Count 4).

E.     *Violation of the ACPA*

The ACPA provides a cause of action against "cybersquatters." *E. & J. Gallo Winery v. Spider*

*Webs Ltd.*, 286 F.3d 270, 274 (5th Cir. 2002). Under the circumstances presented here, the law requires a trademark owner to show that: (1) another person registered, trafficked in, or used a domain name that is "identical or confusingly similar to" the mark at issue; (2) the mark was distinctive at the time the registrant registered the domain name; and (3) the registrant has "a bad faith intent to profit from that mark." 15 U.S.C. § 1125(d)(1)(A).

Whether the registrant acted with bad faith intent is often the crux of the inquiry. *See, e.g.,* *E. & J. Gallo*, 286 F.3d at 275; *Texas Int'l Prop. Assocs. v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 591 (N.D. Tex. 2009). Courts may consider a number of factors "to determine whether someone has acted in bad faith under the ACPA," including:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; . . .
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

*E. & J. Gallo*, 286 F.3d at 274–75 (quoting 15 U.S.C. § 1125(d)(1)(B)(i)).

A court may not find "bad faith intent" if it "determines that the [registrant] believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Id.* (quoting 15 U.S.C. § 1125(d)(1)(B)(ii))."If a court finds an ACPA violation it 'may order the transfer of the domain name to the owner of the mark and may award statutory damages.'" *Id.* (citing 15 U.S.C. §§ 1125(d)(1)©, 1117(d)).

Sting argues that it has sufficiently alleged the elements of its ACPA claim. Doc. 14, Resp., 15. Sting states that it has proven "(1) that its mark is distinctive; (2) that Rated register[ed] or uses a domain name that is 'identical or confusingly similar to that mark'; and (3) that Rated 'has a bad faith intent to profit from the mark." *Id.* (quoting 15 U.S.C. § 1125(d)(1)(A)). First, the TEXAS CUP mark is distinctive, Sting claims. *Id.* at 1–7. Second, Rated "obtained a URL . . . (https://texascup.com) which not only improperly employs Sting's mark, but is also strikingly similar to Sting's Texas Cup URL for its site (https://texascupsoccer.com)." *Id.* at 15. And third, Sting claims that Rated acted with bad faith intent because "'[a]ll of Rated's efforts are calculated to profit off of Sting's Texas Cup trademark and its established history,' as evidenced by the fact that even after receiving notice of Sting's claim," Rated changed its tournament's name but "nonetheless 'continues to use the name 'Texas Cup' throughout its marketing materials and social media posts." *Id.* at 6. In support of its allegations of bad faith intent, Sting cites *Advantage Media Group v. Smart Discipline, LLC*, 2010 WL 11538262, at \*11–12 (M.D. La. Jan. 12, 2010), and *Full Sail, Inc., v. Dauben, Inc*., 2008 WL 2434313, at \*4 (N.D. Tex. June 17, 2008).

Rated claims that Sting has not shown "that it owns rights to the 'Texas Cup' trademark;" has not sufficiently alleged that the mark, if owned, is distinctive or famous; and cannot show that

Rated acted with the bad faith intent required by the ACPA. Doc. 11, Mot., 12; Doc. 15, Reply, 9–10. Rated argues that it "used a domain name that was not in use by anyone at the time and should be available for anyone to use given the genericness of the term 'Texas Cup.'" Doc. 11, Mot., 12. Rated also claims that the *Advantage Media Group* and *Full Sail* cases Sting cites do not support a finding of bad intent in the present case. Doc. 15, Reply, 9. In *Advantage Media Group*, Rated argues, the contested domain name was "more similar to the plaintiff's services than to the defendants' and . . . the defendants" had no legitimate reason to register or use the contested domain name. *Id.* (citing *Advantage Media Grp.*, 2010 WL 11538262, at *36. Here, Rated notes, the Texas Cup domain name it registered was descriptive of Rated's event and is consistent with the names Rated typically uses for its other events. *Id. Full Sail*, Rated claims, is not applicable because it involved a registered trademark and the TEXAS CUP mark is unregistered. *Id.* (citing *Full Sail*, 2008 WL 2434313, at *4).  Finally, Rated claims that the fact that Rated changed the name of its event from Texas Cup to Texas Super Cup after receiving Sting's demand letter "shows [Rated]'s good faith intent, not a bad faith intent." *Id.*

The Court agrees with Sting that the *Advantage Media* and *Full Sail* cases support Sting's claim that the above pleadings are sufficient to survive a motion to dismiss. In *Advantage Media Group*, a plaintiff claimed that the defendant's URL thesmarttransformation.com was confusingly similar to plaintiff's mark, THE TOTAL TRANSFORMATION. *Advantage Media Grp.*, 2010 WL 11538262, at *11. The plaintiff pleaded  examples of the registrant's bad faith including:

> (a) The domain name thesmarttransformation.com is confusingly similar to Plaintiff's THE TOTAL TRANSFORMATION trademark and confusingly similar to Plaintiff's website, www.thetotaltransformation.com.
> (b) The domain name, thesmarttransformation.com, is used to attract consumers looking for Plaintiff and divert to the [defendants' site].
> © Even after being put on notice of Plaintiff's objection, through Google, Defendants

continued to maintain the offending website.

*Id.*

The court held that "[s]uch allegations of bad faith are sufficiently specific to withstand defendants' motion to dismiss." *Id.* In *Full Sail*, a registrant obtained the URL <u>fullsailuniversity.com</u>, which a plaintiff educational institution alleged was confusingly similar to its registered mark FULL SAIL. *Full Sail*, 2008 WL 2434313, at *1. The plaintiff claimed that would-be customers searching for the plaintiff's programs would instead find the registrant's site, which featured "advertising with hyperlinks to other educational institutions." *Id.* Finding that the plaintiff adequately "allege[d] that its mark is widely recognized, distinctive, and registered with the USPTO for educational services[,] . . . defendant registered and used [a URL] us[ing] the FULL SAIL mark[,] . . . the domain name confuses unwitting consumers, and that the defendants registered and used the domain name with bad faith intent to profit from [the] mark," the court declined to dismiss the plaintiff's ACPA claim. *Id.* at *4. The court noted that the FULL SAIL mark was registered, but considered that registration only as proof of the mark's distinctiveness. *See id.* (noting that "the plaintiff must prove . . . that its mark is distinctive"). As discussed above, this Court has already found that Sting sufficiently pleads that TEXAS CUP—though unregistered—is distinctive, which is what the ACPA requires. *See id.*

Taking Sting's pleadings as true and construing them in Sting's favor, the Court finds that Sting's pleadings plausibly support a claim under the ACPA. First, as discussed above, Sting has plausibly alleged that TEXAS CUP is a legally protectable, distinctive mark. The pleadings also plausibly allege that the mark was distinctive when Rated registered the <u>texascup.com</u> URL, since Sting pleads that it has used the mark in the soccer community for 30 years, that its Texas Cup tournament was attended by hundreds of teams and scouts in 2019, and that Rated did not begin

marketing its rival Texas Cup via the URL until "recently." Doc. 9, Am. Compl., ¶¶ 12–14, 17. Second, Sting sufficiently alleges that Rated's texascup.com site is identical or confusingly similar to the TEXAS CUP mark because Rated's URL is identical to Sting's mark and Rated's site mimics the color scheme of Sting's site. *Id.* ¶ 19. And third, Sting's allegations plausibly support an inference of Rated's bad faith intent. Sting alleges that Rated registered a URL that it either knew or should have known infringed Sting's mark "to attract customers looking for Sting and divert them to Rated instead." *Id.* ¶ 49. Furthermore, Sting pleads that "Rated has continued to maintain the offending web site" and registered teams via the texascup.com URL even after it changed the tournament's name, a possible indicator of bad faith. *Id.*

Therefore, giving the benefit of the doubt to Sting—as is appropriate at this stage—Sting's allegations of Rated's bad faith intent in registering and using the URL sufficiently support an ACPA claim. *C.f. Stat Ltd. v. Beard Head, Inc.*, 60 F. Supp. 3d 628, 633–34 (E.D. Va. 2014) (noting that "determination of [a registrant's] bad faith intent and the distinctiveness or famousness of the [contest] mark are inherently factual issues and require a development of a more complete record"); *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 765 (N.D. Ill. 2008) (finding that where cybersquatting claims involved disputed facts the issue of bad faith intent was inappropriate for resolution on a 12(b)(6) motion to dismiss).

For these reasons, the Court **DENIES** Rated's motion to dismiss Count 5.

F.    *Unjust Enrichment*

"Under Texas law an unjust enrichment claim requires showing that one party 'has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.'" *Digit. Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365, 379– 80 (5th Cir. 2020) (quoting *Heldenfels Bros.,*

*Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)). When unjust enrichment claims are based on alleged trademark infringement, courts in the Fifth Circuit consider whether an alleged infringer attempted to "palm off" its goods or services as those of the markholder. *See Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 695 (5th Cir. 1992). Courts also consider whether the alleged infringement caused the diversion of revenue from the markholder to the alleged infringer or whether the markholder's business was unaffected. *Id.* (citing *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 919 (Fed. Cir. 1984)).

Sting asserts that "the courts have instructed that an 'identical test applies to claims for trademark infringement, unfair competition, and unjust enrichment under Texas common law.'" Doc. 14, Resp., 16 (quoting *Amazing Spaces*, 608 F.3d at 235 n.7; *YETI Coolers, LLC v. Imagen Brands, LLC*, 2017 WL 2199012, at *2 (W.D. Tex. May 18, 2017); *Primesource Bldg. Prod., Inc. v. Hillman Grp., Inc.*, 2015 WL 11120882, at *3 (N.D. Tex. Mar. 31, 2015)). Therefore, Sting claims that if a court finds sufficient allegations of common law infringement, it should also find sufficient allegations of unjust enrichment. *Id.*

Rated disagrees, arguing that "[t]o prove a claim of unjust enrichment under Texas law," Sting must allege "that [Rated] used [Sting's] good will to 'palm off' goods or services." Doc. 11, Mot., 12 (citing *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 462 (5th Cir. 2017) (quoting *Tex. Pig Stands*, 951 F.2d at 695)). Further, Rated claims that Sting must allege that the "palmed off" goods or services resulted in material gain to Rated and that Rated's gain was at Sting's expense. Doc. 11, Mot., 12–13. But Rated asserts that Sting "has not alleged any facts showing that [Rated]" attempted to "palm off" its tournament as Sting's, or "obtained any monetary benefit at [Sting's] expense . . . through fraud, duress, or undue advantage." Doc. 15, Reply, 10.

Reviewing the cases cited by Sting for the proposition that "an identical test applies to claims for trademark infringement, unfair competition, and unjust enrichment under Texas common law," the Court finds that Sting's statement of the law is not precisely correct. The *Amazing Spaces* court and the Texas court it cited stated that "[a] trademark infringement and unfair competition action under Texas common law presents essentially 'no difference in issues than those under federal trademark infringement actions.'" *Amazing Spaces*, 608 F.3d at 235 n.7 (quoting *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 n. 3 (Tex. App.—Austin 2001, pet. denied)). The *Amazing Spaces* court was discussing only state and federal infringement claims, not unjust enrichment.

Applying the Texas unjust enrichment test articulated by the Fifth Circuit in *Pig Stands* and *Streamline Productions*, the Court finds that Sting has not stated a claim for unjust enrichment because it does not adequately plead that Rated's financial gain caused Sting financial loss. Even if—as Sting arguably alleges—Rated did attempt to "palm off" its tournament as Sting's and trade on Sting's 30 years of good will, *see, e.g.*, Doc. 9, Am. Compl, ¶¶  20, 22–23, 48, 55, Sting's allegations of financial harm are merely conclusory. *Id.* ¶ 56; *see Tex. Pig Stands*, 951 F.2d at 695 (noting that diversion of profit, while not 'a prerequisite to an award of profits' is an important factor for an unjust enrichment claim). Sting states that it has suffered financial injury and alleges that "at least two Sting teams were" tricked into registering for Rated's Texas Cup. Doc. 9, Am. Compl., ¶¶ 20, 28, 56. But Sting does not allege that registrations for Rated's tournament resulted in lost registrations for Sting's tournament or other lost revenue. *C.f. Texas Pig Stands*, 951 F.2d at 695 (noting that the plaintiff restaurant did not show that it lost "a single sale" due to the alleged infringement). Further, the two tournaments are not held at the same time, but approximately six

months apart. *See* Doc. 9, Am. Compl., ¶¶ 12, 17 (noting that the Sting Texas Cup is held on Thanksgiving Weekend while the Rated Texas Cup was held on Memorial Day weekend). So, participation in Rated's tournament does not necessarily preclude participation in Sting's.

Thus, lacking plausible and specific allegations of financial harm, the Court concludes that Rated's motion to dismiss Count 6 should be **GRANTED**. *See Iqbal*, 556 U.S. at 664. Sting's claim for unjust enrichment is therefore **DISMISSED WITHOUT PREJUDICE**. Sting may file an amended complaint pleading additional facts to sufficiently support its unjust enrichment claim within **TWENTY-ONE (21)** days of the date of this Order, should it choose to do so.

## IV.

## CONCLUSION

In sum, for the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Rated's motion to dismiss. Specifically, the Court **DISMISSES WITH PREJUDICE** Counts 3 and 4 of Sting's Amended Complaint (Doc. 9). The Court **DISMISSES WITHOUT PREJUDICE** Count 6.

SO ORDERED.

SIGNED: November 12, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

- 24 -